1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GRANT H. ROMAINE,

                Plaintiff,

        v.

CITY OF POULSBO, a Washington Municipal
Corporation, KATHRYN H. QUADE, Mayor
of Poulsbo, Douglas J. Quade and their Marital
Community; CITY OF POULSBO INTERIM
POLICE JAKE D. EVANS, DEANNA S.
KINGERY, City of Poulsbo Human Resources
Manager, KITSAP COUNTY SHERIFF, SGT.
JAMES MCDONOUGH and DOES 1-20,

                Defendants.

Case No.  C09-5545RJB

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

       This matter comes before the court on the City of Poulsbo's Motion for Summary Judgment

(Dkt. 76), Defendant Kathryn H. And Douglas J. Quade's Motion for Summary Judgment (Dkt. 77),

Defendant Deanna S. Kingery's Motion for Summary Judgment (Dkt. 78), Defendant Jake D. Evans'

Motion for Summary Judgment (Dkt. 79); and the City of Poulsbo's Request to Supplement Its

Motion to Strike After the Court Timelines (Dkt. 136). The court has considered the pleadings filed

in support of and in opposition to the motions and the file herein.

PROCEDURAL HISTORY

On September 8, 2009, plaintiff filed a civil case against (1) the City of Poulsbo, former Mayor of the City of Poulsbo Kathryn H. Quade, City of Poulsbo Interim Police Chief Jake D Evans; City of Poulsbo Human Resources Manager Deanna S. Kingery; and (2) Kitsap County Sheriff and James McDonough.  Dkt. 5.  On September 16, 2009, plaintiff filed an amended complaint.  Dkt. 8. On November 25, 2009, plaintiff filed a Second Amended Complaint.  Dkt. 32.

On January 21, 2010, the court granted the Kitsap County Sheriff and Sergeant James McDonough's motion to dismiss, and dismissed the claims against those defendants.  Dkt. 61.

On February 4, 2010, plaintiff filed a Third Amended Complaint.  Dkt. 68.  An amended pleading supersedes the original pleading. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1546 (9th Cir.1990) ( "[t]he fact that a party was named in the original complaint is irrelevant; an amended pleading supersedes the original" ); *Loux v. Rhay,* 375 F.2d 55, 57 (9th Cir.1967); *London v. Coopers & Lybrand*, 644 F.2d 811 (9th Cir.1981) (claims not realleged in amended complaint are deemed waived); 6 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1476, at 556-59 (1990). After amendment the original pleading no longer performs any function and is "treated thereafter as non-existent," *Loux,* 375 F.2d at 57. The Third Amended Complaint is the current and only complaint before the court.

In the Third Amended Complaint, plaintiff alleges federal civil rights claims under 42 U.S.C. § 1983 and § 1985; and state law claims for negligence, negligent and/or intentional infliction of emotional distress, defamation, and retaliation.  Dkt. 68.

On April 22, 2010, the remaining defendants filed these pending motions for summary judgment.  Dkts. 76, 77, 78, and 79.

RELEVANT FACTS

**Mr. Romaine's Employment with the City of Poulsbo.**  Plaintiff Grant Romaine was a reserve police officer in the Poulsbo Police Department from 1986 until he was hired as a police officer by the City of Poulsbo on August 1, 1989. He served as a detective for the City of Poulsbo from 2000 until December 10, 2007. Mr. Romaine received positive performance reviews in 2000, 2005 and 2006.  See Dkt. 122-4, 122-5, and 122-6.  In his January 1, 2006, evaluation, Mr. Romaine

1   received a commendation. Dkt. 122-6. Sgt. Playter completed the evaluation; Chief Doran agreed

2   with the evaluation; and Mayor Quade signed the evaluation. Dkt. 122-6.

3        Mr. Romaine was a Union employee, and his employment was governed by a Collective

4   Bargaining Agreement (CBA). Dkt. 38-5. The CBA is the complete agreement between the City of

5   Poulsbo and the Poulsbo Police Officers Association with regard to the wages, hours and working

6   conditions for bargaining unit members. Dkt. 38-5, at 4. The CBA provides for a grievance

7   procedure for any claim or dispute related to the interpretation or application of the Labor

8   Agreement. Dkt. 38-5, at 22, et seq. The CBA also provides for final and binding arbitration with

9   regard to any unsettled grievances. Dkt. 38-5, at 22, *et seq*. Mr. Romaine's employment was also

10  governed by the City of Poulsbo's Civil Service rules. Dkt. 80-5, at 2-59.

11       **Courtesy Auto Investigation.** In a statement to the Department of Retirement Systems

12  (DRS), Mr. Romaine stated that, in mid-2006, he received information from a Deputy Prosecutor

13  about a former employee of Courtesy Auto Group, Mr. Olson, who had served time for a crime

14  related to embezzlement from his employer. Dkt. 80-7, at 36-37. The former employee told the

15  deputy prosecutor that Courtesy Auto Group had engaged in insurance fraud against car

16  manufacturers, employees and customers. Dkt. 80-7, at 36-37. Mr. Romaine and Sgt. Mary

17  Howerton interviewed Mr. Olson. Mr. Romaine reported that Mr. Olson told Mr. Romaine and Sgt.

18  Howerton that Mr. Olson had heard the owners of Courtesy Auto Group "talking about owning the

19  city and how they were able to get special consideration from someone who was of importance in the

20  city. He didn't have a name of the person who was being controlled by the Hern's" (Courtesy's

21  owners). Dkt. 80-7, at 37. In the DRS statement, Mr. Romaine stated as follows:

22       After talking to Olson I started following up on the information he provided. I contacted the
         vehicle manufacturers, Courtesy's insurance company, former employees, DOL and even
23       Rick Hern's wife who he was currently in the process of divorcing. The information Olson
         provided concerning the frauds seemed to be valid even though some of the statute of
24       limitations had expired. As for the information concerning graft within the city I figured
         whoever it was had to be a department head or elected official. I started by obtaining Public
25       Disclosure Documents relating to everyone who had run for city office for the two prior
         elections. Ths included everyone whether they won or lost. Everything seemed in order
26       except for the Mayor. Her resume had shown she had worked as an aerobics instructor and
         artist. Her PDC documents showed that she had over $100,000.00 in income for consulting.
27       Actual amounts or bank records did not have to be disclosed to the PDC since at the time
         Poulsbo had a reported population of less than 10,000. This threw up red flags and I felt
28       further investigation was warranted. Therefore I contacted Special Agent Patric Gahan of the
         FBI Field Office in Silverdale for direction on how to proceed. He gave me some information

and told me that if my investigation seemed to be progressing in the direction of graft by an elected official he would want to interview Olson.

Dkt. 80-7, at 37-38.

Then-Chief Doran testified at his deposition that it would have been unusual that Mr. Romaine would be conducting an investigation of the mayor without advising the Chief of that. Dkt. 80-4, at 47. Chief Doran stated that he did not recall knowing that Mr. Romaine was investigating the mayor. Dkt. 80-4, at 49. When asked if it would be "inappropriate for Detective Romaine to be investigating the mayor when he had been an open or vocal opponent of the mayor's policies," Chief Doran responded that "[t]here could be a concern about his impartiality." Dkt. 80-4, at 47. Chief Doran stated that he would have gotten an outside agency to do an investigation, if there had been a viable complaint of political corruption. Dkt. 80-4, at 47- 48.

Chief Evans, who started as interim Chief in March of 2007, testified in a deposition that Mr. Romaine told Chief Evans at their initial one-on-one meeting that "he was investigating Mayor Quade for influence peddling"; and that Mr. Romaine had contacted the FBI regarding the matter. Dkt. 80-3, at 12. Mr. Romaine stated in his declaration that he told Chief Evans that Mayor Quade "was simply a 'person of interest' in an ongoing investigation." Dkt. 122-77, at 3. Chief Evans did not believe that this was a credible, or legitimate, investigation. Dkt. 80-3, at 13. Chief Evans spoke with the Silverdale FBI agent, who indicated that Mr. Romaine had contacted him about the matter, but that "he didn't feel that it was a legitimate or any kind of credible allegation against the mayor." Dkt. 80-3, at 13-14. Chief Evans then contacted Mayor Quade and asked if she had gotten any contributions from Courtesy Auto Group; she told him that she didn't recall, but that she would check her records. Dkt. 80-3, at 14. Chief Evans testified at his deposition as follows:

> I had two or three things that were really alarming me about this whole situation. Number one, Mr. Romaine, as an employee of the city, begins an investigation against the chief executive officer of the city. Why wouldn't the chief going out tell me about that? He did not. Number two, he doesn't have the authority to investigate her, because his investigative authority flows from her. So therefore, in any kind of corruption allegation, the FBI has primary jurisdiction over corruption of public officers. And they investigate them thoroughly. And they have gotten all kinds of convictions. You read it in the news all the time. So it is highly improper, illegitimate, and certainly ill advised to began an investigation in the Poulsbo Police Department against the chief executive officer of the city, because the allegation could be made later that that investigation is corrupt on its face, because the investigator was under the control of the chief executive officer. So that's why you don't do these things. And third, my concern was, if this were true, did I even want to work there? And I would not have worked there if I believed it to be true....

ORDER
Page - 4

Dkt. 80-3, at 14-15.

Mr. Romaine stated in his declaration that, within two days after Chief Evans informed Mayor Quade of Mr. Romaine's investigation, Chief Evans prohibited Mr. Romaine from warming up his police vehicle.  Dkt. 122-77.  Mr. Romaine stated that Chief Evans ordered Mr. Romaine not to conduct any further investigation possibly involving Mayor Quade; not to discuss the investigation with any other law enforcement agencies; to remove any reference to Mayor Quade from his written investigative reports; and not to contact other officers on the Poulsbo Police Department concerning investigations or the administration of the police department, as a group or through official or private e-mail without prior permission from Chief Evans or a sergeant; and not to contact individuals from other law enforcement agencies for information or assistance in performing his duties, without prior permission of Chief Evans or a supervisor.  Dkt. 122-77, at 4-5.

It appears that Mr. Romaine finished the investigation and submitted a report to the Prosecutor's Office, which declined to take action.

**Mr. Romaine's Activities Regarding Mayor Quade and Voicing Opinions About City Government Issues.** Mayor Kathryn Quade was elected to office in November of 2005 and took office on January 1, 2006.

Mr. Romaine stated in his declaration that Mayor Quade wanted to shut down the police department and contract police services to the Kitsap County Sheriff's Department.  Dkt. 122-77, at 2. Defendants maintain that, in 2007, the Poulsbo City Counsel was working with a consulting firm to define the scope of a study the City of Poulsbo wished to conduct to improve efficiency at City Hall.  The Council had requested that the consultants provide information on the costs associated with maintaining a separate police department instead of contracting for police services with Kitsap County.

Mr. Romaine stated in a declaration that he was troubled by the direction Mayor Quade was taking the City of Poulsbo and the police department.  Dkt. 122-7.  Mr. Romaine appeared at city council meetings and spoke against Mayor Quade's policies; and wrote articles to local newspapers expressing his opposition to Mayor Quade's plans.  Dkt. 122-77, at 2.

Mr. Romaine sent a letter to the Editor of the Kitsap Sun, that was published in February of 2007. Then Chief Doran testified in his deposition that Mayor Quade called him and Mr. Romaine to her office, but had told Mr. Romaine wait outside while she spoke to Chief Doran. Dkt. 80-4, at 38-40. Chief Doran stated that Mayor Quade asked if Department policy allowed officers to directly communicate with the press; Chief Doran informed her that Mr. Romaine was acting as a citizen, and therefore his conduct was within his rights to freedom of speech. Dkt. 80-4, at 38-40. Chief Doran testified at his deposition that "[s]he was unhappy that it couldn't go the way that she wanted it to go, but I think she realized fairly quickly that what I was saying was correct. And as I recall, that was pretty much the end of it." Dkt. 80-4, at 40. Mr. Romaine stated in his declaration that, while he was waiting outside Mayor Quade's office, he

> heard her yelling at Chief Doran, questioning how he could allow me, who worked for her, to write something contrary to her position. I heard Doran explain that as a citizen, I had freedom of speech and my opinion could not be censored. I heard Quade yelling that she could not believe that applied to a person working for her. A few minutes later, Quade came out of her office and chastised me, telling me I was wrong for sending my opinion to the newspaper.

Dkt. 122-77, at 2. HR Manager Deanna Kingery testified in her deposition that she may have discussed with Chief Evans and Mayor Quade the issue of whether Mr. Romaine had the right to speak up in council meetings to oppose agenda items. Dkt. 122-69, at 33. Chief Evans testified that Ms. Kingery had discussions with him about asking Mr. Romaine to refrain from speaking at the council meetings regarding Mr. Romaine's opposition to contracting for police services and his opposition to Mayor Quade. Dkt. 122-68, at 53.

Mr. Romaine stated that many other police officers and citizens joined him in voicing their disapproval, including placing "Save Poulsbo's Police Department" lawn signs. Dkt. 122-77, at 2. Mr. Romaine stated that he believed that his protests helped bring about a citywide campaign against Mayor Quade and to keep Poulsbo's police department. Dkt. 122-77, at 2. By February 21, 2007, this group was successful in getting the City Council to remove the cost comparison of current police operations from the study.

On February 21, 2007 and March 7, 2007, Mr. Romaine appeared before the City Council to express his views on how Mayor Quade and the City of Poulsbo should select a new or interim Chief to replace retiring Chief Doran. At the meeting, Mr. Romaine opposed hiring Interim Chief Jake

Evans, arguing that someone within the Department should be promoted, and that the City of Poulsbo would pay Chief Evans more than it would pay by promoting someone from within. Dkt. 122-77, at 3. Other members of the Police Department opposed hiring an Interim Police Chief was well.

Mr. Romaine alleges that, shortly before one of the City Council meetings at which he spoke, Deanna Kingery, HR Department Head, asked Mr. Romaine if he was going to be a "team player".

The City Council's decisions regarding the scope of the efficiency study and the decision to hire an interim Police Chief had been made by March 7, 2007. Chief Evans was selected as Interim Chief to serve until a new Chief could be hired. He began serving in that position in mid-March of 2007, and served until November of 2007.

**Complaints and Investigation of Mr. Romaine's Conduct.** On July 18, 2007, the Police Department received a citizen complaint, stating that Mr. Romaine had been stalking the citizen. Dkt. 80, Exh. 3, Evans' deposition, Exh. 37. On July 23, 2007, Chief Evans was informed by Sgt. Jim McDonough, an employee of the Kitsap County Sheriff's Department, that the same citizen filed a similar complaint with the Kitsap County Sheriff's Office. Dkt. 80, Exh. 3, Evans' deposition, Exh. 37. Both agencies investigated the complaint, and both determined that the complaints were unfounded. The matter was closed with no disciplinary action.

On September 4, 2007, Sgt. McDonough called Chief Evans and told him that Sgt. McDonough "has run an audit of LINX access by Det. Romaine for 1st 6 months of '07 and Laura Haworths [sic] name is been run. I ask him to copy me those records." Dkt. 80-3, at 47. Laura Haworth was a City of Poulsbo employee. The LInX is a confidential police database that contains information from state and federal law enforcement agencies throughout the Pacific Northwest. An agency that permits misuse of the database runs the risk of losing its access. The user agreement signed by all authorized personnel included a provision that each user has agreed to use the database for official police business only, and in connection with a pending investigation.

Chief Evans asked Mr. Romaine's supervisor, William Playter, and Ms. Haworth's supervisor, Mary Howerton, if either had requested that Mr. Romaine conduct a LInX search on Ms. Haworth; both responded that they had not. On September 12, 2007, Chief Evans asked Lee Fritchman to run an audit of LInX. Dkt. 80-3, at 47.

Mr. Romaine stated in his declaration that he obtained information regarding Ms. Haworth from the Ileads system in order to fill out her training forms, which she had failed to do.  Dkt. 122-77, at 5.  Mr. Romaine stated that, as part of his duty to prepare and maintain police training files, he looked up Ms. Haworth's name because she was a new hire.  Dkt. 122-77, at 5.

On September 13, 2007, Chief Evans made the following note: "I pick up audit report @NCIS–Fritchman points out local FBI agents [sic] name has been run by Romaine. Others are suspicious also."  Dkt. 80-3, at 48.  On September 13, 2007, Chief Evans made a verbal request to Craig Rogers (Bremerton Police Department) for an internal investigator.  Dkt. 80-3, at 48.

On September 18, 2007, Chief Evans requested that the Bremerton Police Department conduct an outside independent internal affairs investigation into the possible misuse of computer equipment and data files by Mr. Romaine. On October 8, 2007, after initial findings outlined violations by Mr. Romaine, Chief Evans notified Mr. Romaine of the complaint, as follows:

> Complaint: On September 4, 2007, I received an audit report from Sgt Jim McDonough of the Kitsap County Sheriffs Office, which showed that you had used the LINX Computer network to run a background check on Laura Haworth.  Further review of the LINX system records revealed numerous inquiries run by you that appear to violate the OFFICIAL USE ONLY rules of that system.

Dkt. 80-3, at 60. Chief Evans placed Mr. Romaine on paid administrative leave while the investigation was pending. Dkt. 80-3, at 59.  Chief Evans told the investigators to be thorough and follow their noses.  While the investigation was proceeding, Chief Evans was briefed on the progress of the investigation.  Chief Evans had regular meetings with Mayor Quade, during which the progress of the investigation was discussed.

On October 31, 2007, the investigative team of the Bremerton Police Department interviewed Mr. Romaine.

On November 5, 2007, Mr. Romaine made a request of Chief Evans that he be paid by using his accrued sick leave, and he also notified the Union of the request.  The City of Poulsbo complied with the request.

Chief Swiney was hired by the City of Poulsbo, and started work on November 21, 2007.  Chief Swiney testified at his deposition that, before he was hired, Chief Evans  told him that "there was an ongoing investigation, there was currently an ongoing internal affairs investigation going on

involving some pretty serious allegations." Dkt. 80-4, at 6.  Chief Swiney was questioned at his

deposition about his conversations with Chief Evans after Chief Swiney was hired, as follows:

Q.  And you also knew Detective Romaine was opposing Quade openly and aggressively on that agenda [feasibility of outsourcing police services]?

A.  Yes.

Q.  Okay.  All right.  So now, at that time did they kind of tell you–did you hear anything about Romaine after you were hired, before Mr. Evans leaves, how to handle the situation with Romaine in any way?  Did you get any input?

A.  No, once–we're moving now into the employ, where I'm actually appointed as the chief of police.  I spent, obviously, a lot of times with Chief Evans, with him orientating me the [sic] community and the inner workings of the police department and all those kinds of things, and then I got more in depth briefings on every–about everything within the organization, including the ongoing investigation.

Q.  And so tell us specifically what did Evans tell you, any input about him after now you were appointed already and you got briefings.  So we can, you know, do one step at a time.  Let's focus on Mr. Evans now.

A.  Okay.

Q.  What did he say about that he has dealt with Mr. Romaine and whatever input he gave?

A.  I'm trying to remember specifically.  But the biggest thing I was concerned with was the ongoing investigation, because that was–you know, that's, the questions and the inquires that I had, because I'm not familiar with the area, I wasn't familiar with the Bremerton Police Department at the time, I wanted to know the specific accusations that were being made, or allegations that were being made, I wanted to meet with the investigators and get a status report from them or where they're at and how the investigation's proceeding.  And a lot of the other stuff was reaffirmed, and I asked for affirmation, again because not only coming in just to run the department, but I also have to deal with and work with the city leadership, the concerns of the community, whatever all those things are.

So some of the feedback that I got, or got reconfirmed again, was that Grant Romaine was kind of leading the charge as far as ensuring that the police department stays intact.  He was passionate about it.  I took it that way.  He felt threatened and felt the department was being threatened, so I didn't have any ill feelings about that.  That he did have some issues and personal issues with Mayor Quade.  And again, that's fine.  Everyone's entitled to their own view and perspective and everything.  So–and that was just–so I was asking those things of Jake Evans just to make sure, you know, I had the information that I needed so I could just be aware of it.  But again, my primary focus was something that I had control over and would ultimately have the authority to make decision on, was the internal affairs investigation, the internal affairs investigation that Bremerton was doing.

Q.  And so what input did Jake Evans specifically tell you about Detective Romaine?  You were having all these input and conversations with him, and briefings.  So I want to know, you know, the communication.  What happened?

A.  Let's–and I believe I stated it.  Without specific–I don't remember specific settings or when it occurred.  He shared with me that, what I just told you, that Mr. Grant Romaine was passionate and showing up to council meetings and voicing his opinion on various topics.  And that was about it.  That was about it.  Specifics, I don't have any more specifics than that.

Just generalities is all we talked about.

Q. Anything else?  Any other subject, other issue Jake Evans mentioned?

A. No.

Q. You say that is about it, so–

A. Yeah, just the–I was focused on, you know, inheriting the investigation and following that, seeing that through.

Q. So he didn't mention any other issue–you know about Detective Romaine, his having issues with the mayor because of disbanding of the police department.  You knew about Detective Romaine is being investigated, internal investigation going on.

A. Correct.

Dkt. 80-4, at 7-10.

While the investigation was proceeding, Mr. Romaine requested that Chief Swiney meet with Mr. Romaine to discuss the investigation; Chief Swiney declined to meet with Mr. Romaine because he did not believe it was appropriate.

On November 21, 2007, the Bremerton Police Department finished the investigation.  The investigative team met with Chief Evans and Chief Swiney to provide them with the findings and report.  Chief Swiney had not at that point met Mr. Romaine.

The investigation report found that Mr. Romaine excessively used the internet for personal reasons; queried police databases for personal use, unrelated to his investigations; was untruthful in answering questions; used his position to pursue women; and had problems interacting with the public.  Dkt. 38-4, at 1-62.

On December 7, 2007, Chief Swiney sent Mr. Romaine a letter, informing him of the allegations and providing him with a copy of the redacted report.  Dkt. 122-19, at 1-2.  The letter stated in relevant part, as follows:

> Based on the provisions of the Collective Bargaining Agreement, Article 22, Section 22.1.18 the investigation demonstrates just cause for disciplinary action, including termination from employment, based on the following statutory and policy violations.
>
> Abuse of your law enforcement authority: RCW §9A.80.010
>
> Unlawful Harassment: RCW § 49.60 and 10.14.020 as well [sic] poulsbo City Policies 2.4 (Anti-Harassment Policy) and 2.5 (Sexual Harassment Prohibited)
>
> Untruthful statements in the course of an internal investigation.  RCW §43.101.105(k)

Poulsbo City Policies, 9.1 (general code of conduct requiring professional conduct and behavior, basic tact and courtesy toward co-workers and the public, preserving City equipment, facilities and resources and providing orderly and cost efficient services to citizens)

Poulsbo City Policies 9.2: (conflicts of interest) and 9.7 (misuse of City equipment, and resources for personal purposes).

Violation of the use agreement fo I/LEADS and LinX, which places in jeopardy our agency's ability to sue and access these vital data bases.

Violations of the Code of Conduct.  Sections 16.1, 16.2, 16.3, 16.4 (violation of the public's trust and commitment to the highest degree of integrity)

Violations of the Cannons [sic] of Ethics, Section 16.6 Standard 1.2, 1.6, 2.2, 2.3, 3.2, 3.3, 3.4. 3.6, 3.7, 4.9, 4.11, 5.1, 5.2, 5.3, 6.1, 6.3, 8.1, 8.2, 9.1, 9.2, 9.4, 9.5, and 16.7.2. In addition, the Law Enforcement Code of Ethics, Section 1.3 (commission abuse).

You will also note the report cites to the case of Brady v. Maryland on page 50.  A copy of the case is attached for your review.

City Policies and Procedures also describe actions subject to disciplinary action, and reference in Section 10.1, unauthorized use of City facilities or property, unauthorized use or position for personal gain or advantage, violation of other City policies, unauthorized operation or use of equipment, discrimination, immoral conduct while on duty, intentional falsification of records or paperwork, inefficiency, negligence and refusal or failure to perform assigned work, lying or dishonesty, commission of a crime connected to the employee's fitness for public services.

Based upon the severity of the misconduct identified in the investigation, it appears termination from your employment and processing this information for the Commission's review under RCW § 43.101.105 is the most likely disciplinary action to result, based on the information currently available to me.

Dkt. 122-19, at 1-2.    The letter also informed Mr. Romaine as follows:

Based upon the information gathered in the investigation, your conduct warrants disciplinary action.  The form of disciplinary action could include termination.  I will not make a fianl decision on what disciplinary action to take until I have had a chance to meet with you, at which time, you can provide me any additional information you deem relevant to the decision making process as set forth in the Collective Bargaining Agreement, Article 22, Section 22.1.19 and .20.

Our meeting will take place on Tuesday, December 11, at 5:00 pm in my office.  You are free to bring a union representative of your choice.

Dkt. 122-19, at 1.

Mayor Quade was not interviewed by the Bremerton Police Department investigators.  There is no evidence that Mayor Quade discussed the investigation with Chief Swiney.

After reviewing the investigator's report, Randy Loun, Mr. Romaine's attorney, contacted Chief Swiney to discuss Mr. Romaine's potential discipline.  Chief Swiney told Mr. Loun that

termination was likely, based upon the results of the investigation.  Mr. Romaine contends that Chief Swiney told Mr. Loun that, if Mr. Romaine resigned, the results of the investigation would be considered inconclusive, and he would be permitted to cash out his sick leave.

On December 10, 2007, Mr. Romaine submitted his letter of resignation.  He did not attend predisciplinary conference scheduled for December 11, 2007.

**Post Resignation.**  On December 11, 2007, after he resigned, Mr. Romaine contacted Deanna Kingery, HR Manager, by e-mail, about his sick leave cash out.  Ms. Kingery responded on December 13, 1007 and December 20, 2007, informing Mr. Romaine that the CBA limited the cash-out of his remaining sick leave. The CBA provided for a grievance procedure, but Mr. Romaine did not pursue that procedure.  Mr. Romaine did not request a hearing under the Civil Service Rules. *See* Dkt. 80-5  46-52.

On November 29, 2007, the City of Poulsbo received a public records request from the Kitsap Sun newspaper regarding the internal affairs investigation related to the complaint against Mr. Romaine.  The City of Poulsbo received a similar request from KING TV.  Mr. Romaine alleges that the public records requests were the result of leaks, apparently by defendants.  On December 11, 2007, Chief Swiney informed Mr. Romaine that the public records requests had been made, and that the redacted investigatory report was likely to be disclosed, absent a court order.  The letter provided Mr. Romaine until December 28, 2007, to obtain a protective order.  Mr. Romaine did not obtain a protective order.  On January 2, 2007, the City of Poulsbo produced the redacted investigatory report to the Kitsap Sun, and on January 3, 2007, the same material was produced to KING TV.

On December 11, 2007, after Mr. Romaine resigned, the City of Poulsbo, through Chief Swiney, filed a change of status report with the Criminal Justice Training Commission, pursuant to RCW 43.101.130.  On July 9, 2008, the Washington State Criminal Justice and Training Commission issued a Statement of Charges, alleging that Mr. Romaine had committed disqualifying misconduct related to his Commission as a Police Officer.  Dkt. 80-6, at 17-20.  The Statement of Charges notified Mr. Romaine that he was entitled to a hearing to contest the charges.  Mr. Romaine waived his right to a hearing, and his Commission as a Police Officer was revoked.

Before Mr. Romaine resigned, the City of Poulsbo was contacted by the State Department of Retirement Systems (DRS) in connection with Mr. Romaine's request for duty-related disability benefits. Ms. Kingery responded to DRS, stating that Mr. Romaine had not notified the City of Poulsbo of any disabling condition that would impact his ability to perform his job duties while he had been employed as a detective.  Dkt. 80-6, at 25-27. On October 8, 2008, Mr. Romaine's counsel responded to DRS.  Dkt. 80-6, at 30.  On October 31, Ms. Kingery replied to Mr. Romaine's counsel's response.  Dkt. 80-6, at 32-34.  On October 27, 2009, Ms. Kingery testified at the administrative hearing that was conducted to determine Mr. Romaine's eligibility for a disability retirement.

Ms. Kingery was hired by the City of Poulsbo in the late 1990s.  In January of 2004, her position was converted to a Department Head position within the City's organizational structure.  In January 2007, her job title changed from HR analyst to HR manager.  Her job duties included the performance of all HR functions, maintaining personnel records, implementing and adhering to the City of Poulsbo policies, procedures and regulations, including the Collective Bargaining Agreement with the Poulsbo Police Officers Association, and responding to all agency requests regarding employees as required by the custodian of records for the City of Poulsbo.

The City of Bremerton, the City of Bremerton Police Department, and the officers who conducted the independent investigation are not defendants in this case.  Chief Swiney is not a defendant.

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must

present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

<u>MOTIONS</u>

Defendants filed motions for summary judgment, requesting that the court dismiss all of the federal and state law claims. This order focuses on the federal claims over which the court has original jurisdiction. The court will address the supplemental jurisdiction issue after the federal claims are discussed.

**A. City of Poulsbo's Motion for Summary Judgment (Dkt. 76).** The City of Poulsbo contends that (1) Mr. Romaine's procedural and substantive due process claims are precluded by collateral estoppel and waiver; Mr. Romaine admitted misuse of City of Poulsbo computers and the restricted confidential police data bases; there is no proof of an adverse action because Mr. Romaine voluntarily resigned and was not constructively discharged; (2) Mr. Romaine's due process claim is subject to dismissal because he received all the process he was due; (3) the federal claims are subject to state and federal immunity; (4) there is no showing of racial or class-based discriminatory animus, as is required to sustain a claim under 42 U.S.C. § 1985(3); (5) the First Amendment retaliation claim

is subject to dismissal because is no showing that his speech involved a matter of public concern; the complaint that prompted an internal investigation was not motivated by a retaliatory purpose; there were no adverse consequences for two years for his speech criticizing Mayor Quade and the Council; and the City of Poulsbo took no adverse action connected with his speech; and there is no causal link between Mr. Romaine' resignation and protected act.

**B.  Defendant Kathryn H. And Douglas J. Quade Motion for Summary Judgment (Dkt. 77)**.  Mayor Quade and her husband Douglas Quade contend that (1) the First Amendment Freedom of Speech claim should be dismissed  because the speech at issue was made pursuant to Mr. Romaine's duties and, therefore, was not protected speech; there was no adverse employment action; and Mr. Romaine cannot attack either the conduct of the investigators or the investigation's findings; (2) Mr. Romaine has not made a showing that he was deprived of procedural due process because he failed to follow the procedures set forth in the CBA and Civil Service Rules; (3) the substantive due process claim fails because Mr. Romaine has not shown that Mayor Quade did anything to shock the conscience or interfere with ordered liberty; (4) the Equal Protection claim should be dismissed because Mr. Romaine has not shown that he is a member of a protected class, nor that Mayor Quade acted with an intent and purpose to discriminate against him based on his membership in the protected class; and (4) Mr. Romaine has not shown that any constitutional deprivation was clearly established at the time of the conduct.

**C.  Defendant Deanna S. Kingery's Motion for Summary Judgment (Dkt. 78).**  Ms. Kingery contends that Ms. Kingery is entitled to qualified immunity for plaintiff's claims under 42 U.S.C. §§ 1983 and 1985.

**D.  Defendant Jake D. Evans' Motion for Summary Judgment (Dkt. 79).** Mr. Evans contends that (1) he is entitled to qualified immunity for claims under 42 U.S.C. §§ 1983 and 1985, because plaintiff fails to show that Mr. Evans deprived him of or retaliated against him for protected speech; fails to show that Mr. Evans deprived him of his due process rights; fails to show that Mr. Evans violated his rights to equal protection; and fails to show that any alleged deprivation was contrary to a clearly established right.

1  **E.  Mr. Romaine's Response to Motions for Summary Judgment (Dkt. 124)**.  Mr.

2  Romaine opposes defendants' motions for summary judgment, arguing that (1) Mayor Quade, Chief

3  Evans, and Ms. Kingery were acting under color of law; (2) Mr. Romaine's engaged in protected

4  speech on matters of public concern when he appeared before the Poulsbo City Council and wrote a

5  letter to the Kitsap, opposing contracting out police services; when he spoke out at Poulsbo City

6  Council meetings concerning the moving of and building of a new city hall; when he opposed hiring

7  Chief Evans on an interim basis rather than simply promoting a sergeant to the interim position; and

8  when he told Chief Evans that Mayor Quade was a person of interest in the Courtesy Auto

9  investigation; defendants  took adverse employment actions as a result of Mr. Romaine's protected

10  speech, including Mayor Quade calling Mr. Romaine to her office; Chief Evans issuing "ridiculous

11  orders," placing Mr. Romaine in a position in which he could not do his job without violating Chief

12  Evans' orders; and Chief Evans attempts to "muzzle" Mr. Romaine's investigation (Dkt. 124, at 33);

13  and the protected activity was a substantial or motivating factor in defendants' conduct, as shown by

14  Mr. Romaine's previous very favorable evaluations, the short time between Mr. Romaine's protected

15  speech and the adverse employment actions, and defendants' knowledge of Mr. Romaine's speech;

16  and (3) defendants violated Mr. Romaine's right to procedural due process because he was given

17  only a redacted copy of the investigative report, even after he demanded an unredacted version of the

18  report from the City of Poulsbo. Dkt. 124.

19  **F.  Defendants' Replies to Plaintiffs' Responses (Dkt. 129, 130, 131, 132)**.  On June 11,

20  2010, defendants filed replies to Mr. Romaine's responses.  The City of Poulsbo requests that the

21  court strike certain documents.  Dkt. 129, at 1-5.  The City of Poulsbo maintains that (1) the Section

22  1985 claim, equal protection claim and procedural due process (liberty) claim, and claims against

23  Douglas Quade should be dismissed because Mr. Romaine failed to address these claims in his

24  response; (2) Mr. Romaine has not provided evidence of a policy or custom sufficient to state a claim

25  for municipal liability against the City of Poulsbo; (3) Mr. Romaine has not shown that any adverse

26  actions resulted from his speaking out against Mayor Quade; (4) Mayor Quade's statements about

27  Mr. Romaine's criticism of her do not constitute adverse actions; (5) placement of Mr. Romaine on

28  administrative leave pending the investigation by the Bremerton police department does not

constitute an adverse action; (6) Mr. Romaine has not shown that his protected activities are related to his alleged adverse employment actions; and (7) Mr. Romaine had procedural remedies available through the CBA and the Civil Service Rules.  Dkt. 129.

Chief Evans contends in his reply brief that (1) all officers were ordered not to leave their cars in the parking lot unattended; (2) it was not appropriate for Mr. Romaine to investigate alleged corruption by Mayor Quade; and (3) other facts related to Mr. Romaine's investigation of Mayor Quade, even if Mr. Romaine's version of the facts is true, are not material because of the independent, intervening facts of the case. Dkt. 130.

In her reply brief, Ms. Kingery contends that Mr. Romaine has not produced any evidence that Ms. Kingery violated a known constitutional right. Dkt. 131.

Mayor Quade argues in her reply brief that (1) her actions did not deprive Mr. Romaine of his freedom of speech, since he continued to voice his opposition to Mayor Quade after she criticized him to others; (2) Mayor Quade did not participate in any adverse action against Mr. Romaine; and (3) Mr. Romaine was provided all of the procedural due process to which he was entitled. Dkt. 132.

<u>DISCUSSION</u>

**1.  Motion to Strike (Dkt. 129)**

The City of Poulsbo requests that the court strike plaintiff's briefing and supporting evidence regarding sanctions; portions of Mr. Romaine's declaration (Dkt. 122-7); transcripts of testimony at the administrative hearing for the Washington Department of Retirement Systems (Dkt. 122-62, 122-63, 122-64, and 122-65); any document not expressly relied upon in the response brief; and any language by which plaintiff simply disputes a paragraph contained in defendants' motions.  Dkt. 129, at 1-5.

Although defendants raise the issue in their motions that they intend to seek sanctions against Mr. Romaine for filing, and continuing to litigate, this action, they did not specifically request sanctions.  A request for sanctions under Fed.R.Civ.P. 11 must be made by separate motion.  See Fed.R.Civ.P. 11(c)(2).  Accordingly, the portion of Mr. Romaine's brief that deals with sanctions (Dkt. 124, at 89-102) and the supporting documents should be stricken.  The transcript of testimony at the DRS hearing is sufficiently authenticated for purposes of this summary judgment; defendants'

motion to strike that material should be denied.  The motion to strike portions of Mr. Romaine's declaration, any documents not expressly relied upon in the response brief, and any language by which Mr. Romaine simply disputes a paragraph contained in defendants' motions should be denied; the court will accord proper weight to the documents in the record.

### 2.   City of Poulsbo's Request to Supplement Its Motion to Strike After the Court Timelines (Dkt. 136)

On June 17, 2010, the City of Poulsbo filed a motion, requesting that the City be permitted to file a supplemental motion to strike certain material in Mr. Romaine's supplemental declaration (Dkt. 127), due to the late filing of that supplemental declaration.  Dkt. 136.  The City of Poulsbo has shown good cause for filing the supplemental motion to strike; the court should grant the request to file the supplemental motion to strike.

In the supplemental motion to strike, the City requests that the court strike portions of Mr. Romaine's declaration, contending that certain statements are speculative and involve opinion, not facts; strike e-mails as inadmissible hearsay; and strike certain deposition transcripts as improperly authenticated.

The deposition transcripts are sufficiently authenticated for purposes of this summary judgment; the City of Poulsbo's motion to strike that material should be denied.  The motion to strike portions of Mr. Romaine's declaration and the e-mails should be denied; the court will accord proper weight to the documents in the record.

### 3.   Claims under 42 U.S.C. § 1983 and § 1985 Against Douglas Quade

Mr. Quade has moved for dismissal of the claims against him.  Dkt. 77.  In his response to the motions for summary judgment, Mr. Romaine did not address or raise any issues of fact that would meet his burden to state a claim against Douglas Quade, with regard to Mr. Romaine's federal claims. In his exhibits to the response to the motions for summary judgment, Mr. Romaine included a copy of an announcement that Mr. Quade had resigned as CEO of the Port Gamble S'Klallam tribe in January of 2007.  Dkt. 122-11.  There is no indication that this exhibit is related to any claims in this case against Mr. Quade.  Mr. Quade's motion for summary judgment should be granted as to the federal claims asserted against him, and those claims should be dismissed.

**4.  Federal Claims Against Kathryn Quade, Jake Evans, and Deanna Kingery under 42 U.S.C. § 1983**

*Claims*.  In the Third Amended Complaint, plaintiff alleges that  Kathryn Quade, Deanna Kingery, and Jake Evans acted with deliberate indifference and retaliatory animus to deprive Mr. Romaine of his right to free speech; his property rights in job and occupation; his due process rights to a fair and impartial charge, investigation and hearing; his right to due process; and his right to equal protection, all in violation of the United States Constitution.  In his response to the motions for summary judgment, Mr. Romaine clarified that he is not alleging a violation of substantive due process.  See Dkt. 124, at 35.

In their motions for summary judgment, Mayor Quade, Ms. Kingery, and Chief Evans contend that they are entitled to qualified immunity with regard to the federal constitutional claims.

*Legal Standard for Qualified Immunity*.  Defendants in a Section 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case.  *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.  While the sequence set forth in *Saucier* is often appropriate, it should no longer be regarded as mandatory. *Pearson v. Callahan*, at 129 S.Ct at 811. "The judges of ... the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.

The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.  *Saucier v. Katz*, 121 S.Ct. at 2156.

*Due Process.*   In the Third Amended Complaint, plaintiff alleges that defendants violated his right to procedural Due Process under the Fourteenth Amendment to the United States Constitution.

The first prong of the qualified immunity test will be addressed first: whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable Mr. Romaine.

The Fourteenth Amendment protects individuals from the deprivation of property without due process of law. There are three elements for procedural due process claims under Section 1983:(1) a property interest protected by the Constitution; (2) a deprivation of that interest by the government; and (3) a lack of process. *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). A public employer may meet its due process obligations by providing a collective bargaining agreement if that agreement contains grievance procedures that satisfy due process. *Armstrong v. Meyers*, 964 F.2d 948, 950 (9th Cir.1992).

Due process is a question of whether adequate administrative procedures exist to protect an employee from arbitrary employment decisions, or actions in violation of a bargaining agreement. *Lombardi v. Board of Trustees Hinsdale School Dist. 86*, 563 F.Supp.2d 867, 872 (N.D. Ill 2006). Mr. Romaine's procedural rights are the rights afforded him under the CBA and the City of Poulsbo Civil Service Rules.  Mr. Romaine had a predisciplinary conference scheduled for December 11, 2007; he resigned before the hearing.  The CBA provided for an evidentiary grievance hearing before an independent arbitrator.  The Civil Service Rules provided for an evidentiary hearing before the City of Poulsbo Civil Service Commission.  Mr. Romaine failed to participate in the predisciplinary conference, and he failed to pursue the grievance procedures under the CBA and the Civil Service

Rules.  Mr. Romaine contends that he was given only a redacted copy of the investigatory report, and that "[t]he City of Poulsbo refused to give either me or my attorney an unredacted copy."  Dkt. 122-77, at 6.  Mr. Loun does not state in his declaration that he requested and/or was refused a copy of the unredacted report.  Further, Mr. Romaine has not alleged that a specific individual refused to give him or his attorney an unredacted copy; he has not shown that or how the "City of Poulsbo" could or did deny any request for an unredacted copy. Further, this issue could have been raised, and a new request made for an unredacted copy of the investigative report, during a CBA grievance process or under the Civil Service Rules.  Mr. Romaine has not shown that there is an issue of fact regarding his claim that the City of Poulsbo violated his right to Due Process.

Because Mr. Romaine has not met his burden to establish that there is an issue of fact as to whether Mayor Quade, Ms. Kingery, and Chief Evans violated his right to Due Process, it is unnecessary to determine whether any such right was clearly established at the time of the conduct at issue.

*Freedom of Speech***. In the Third Amended Complaint, plaintiff alleges that Mayor Quade, Ms. Kingery, and Chief Evans violated his right to Freedom of Speech, under the First Amendment to the United States Constitution.

The first prong of the qualified immunity test will be addressed first: whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable Mr. Romaine.

In order to determine whether the speech was constitutionally protected, the court must determine whether the speech involves a matter of public concern, and must balance the interest of the employee as a citizen commenting on matters of public concern with the interest of the State as employer in providing effective and efficient public service. *Connick v. Myers*, 461 U.S. 138, 147-150 (1983). "The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern." *Huppert v. City of Pittsburg*, 574 F.3d 696, 702 (9th Cir. 2009). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The court employs a

"sequential five-step series of questions" to determine whether an employer impermissibly retaliated against an employee for protected speech:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir.2009); *see Huppert v. City of Pittsburg*, 574 F.3d at 702 (applying *Eng* test). If the plaintiff meets the first three elements of the test, the burden shifts to the defendant to show that it would have taken the adverse employment action even absent the protected speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 976 (9th Cir.2002)

Mr. Romaine's opposition to Mayor Quade's attempt to contract out police services and her recommendation to hire Chief Evans on an interim basis are matters of public concern, and are, therefore protected speech.  Mr. Romaine was speaking as a private citizen on these matters.

Mr. Romaine's investigation of Mayor Quade for political corruption, or his identifying Mayor Quade as a person of interest in that investigation, was directly related to Mr. Romaine's job duties.  The First Amendment does not protect Mr. Romaine's statements made in the context of that investigation. Any statements made during the investigation were, therefore, not protected speech. However, for the purposes of this qualified immunity analysis, the court assumes that any statements made during the course of that investigation about Mayor Quade related to corruption, kickbacks, etc., were matters of public concern.

Under the *Eng/Pickering* test, the court next inquires whether the protected speech was a substantial or motivating factor in the adverse employment action, whether the employer had an adequate justification for intending to terminate Mr. Romaine, and whether the employer would have taken the adverse employment action even absent the protected speech.

The can court assume that Mayor Quade was unhappy that Mr. Romaine spoke out at City Council meetings, sent letters to the press, and investigated her for political corruption, or at least, identified her as a person of interest in his investigation.  The court also can assume that Mayor

Quade, Ms. Kingery and Chief Evans talked to each other about Mr. Romaine's statements, and that Ms. Kingery asked Mr. Romaine if he was going to be a "team player."

The record shows, however, that the protected speech was not a substantial or motivating factor in the decision to terminate Mr. Romaine.  The complaint that Mr. Romaine improperly accessed the police database to obtain information on Ms. Haworth came from Sgt. McDonough. There is no evidence in the record that Sgt. McDonough had any motivation to retaliate against Mr. Romaine for his opposition to Mayor Quade. Whether Sgt. McDonough gained this information in compliance with or in violation of the Kitsap County Sheriff's Office policy is irrelevant to whether Mr. Romaine violated the City of Poulsbo policies.

After he received the complaint from Sgt. McDonough, Chief Evans asked Lee Fritchman to run an audit of Mr. Romaine's use of the LInX system.  When that audit showed problems with Mr. Romaine's use of the LInX system, Chief Evans requested that the City of Bremerton Police Department conduct an independent investigation. The City of Bremerton and its police department are not defendants in this action, and there is no allegation that the investigators violated any of Mr. Romaine's constitutional rights.  The investigation revealed a wide range of violations of policy and inappropriate conduct on Mr. Romaine's part. Chief Swiney made the decision to terminate Mr. Romaine, based upon the results of the investigation.  Chief Swiney is not a defendant in this case, and there is no allegation that Chief Swiney violated any of Mr. Romaine's constitutional rights.

Chief Evans was interviewed by the City of Bremerton investigators. Dkt. 122-40. Chief Evans related incidents and his impressions of Mr. Romaine to the investigators.  Dkt. 122-40. Chief Evans did not say anything to the investigators about Mr. Romaine's public criticism of Mayor Quade. Chief Evans told the investigators that Mr. Romaine had been investigating Mayor Quade for improper campaign contributions.  Dkt. 122-40, at 2.  Chief Evans told the investigators that he had contacted the FBI agent, and the FBI agent told Chief Evans that the information was not credible. Dkt. 122-40, at 2. Chief Evans suggested that the investigators follow their noses, and asked that they be very thorough.  Dkt. 122-40, at 3. There is no evidence that the Bremerton Police Department investigation was anything other than independent.  The investigation did not refer to or involve any of Mr. Romaine's City Council appearances, his letters to the press, or his investigation of Mayor

Quade for corruption/improper campaign contributions. There is no allegation, or any evidence, that the investigators had any improper motive to terminate Mr. Romaine for his Free Speech activities.

Chief Evans kept Mayor Quade informed of the progress of the investigation. There is no evidence that Mayor Quade had any influence over the Bremerton Police Department investigation. The investigators did not interview Mayor Quade. There is no reference in the investigative report to any criticism Mr. Romaine had of Mayor Quade or to Mr. Romaine's investigation of Mayor Quade's corruption/improper campaign contributions. Finally, there is nothing in the investigation related to Ms. Kingery's opinion of Mr. Romaine.

Chief Swiney relied on the Bremerton Police Department investigation in deciding to issue the December 7, 2007 letter, in which Chief Swiney informed Mr. Romaine was informed of the charges and of Chief Swiney's determination that there was just cause for disciplinary action, including termination from employment. Although Chief Swiney was informed by Chief Evans of issues regarding Mr. Romaine while the investigation was in progress, there is no evidence that Chief Swiney's decision was based on anything other than the results of the investigation. Chief Swiney was hired after the decision was made to retain the police department rather than to contract for police services. Mr. Romaine does not allege, nor is there any evidence, that Chief Swiney intended to retaliate against Mr. Romaine for his previous advocacy to retain the department (and, ultimately, Chief Swiney's position as chief of that department). There is no evidence that Chief Swiney had any motivation to discipline Mr. Romaine for any other Free Speech activities.

Mr. Romaine has not shown that the results of the Bremerton Police Department investigation were influenced by Mr. Romaine's protected speech. There is no showing that Chief Swiney's decision to take disciplinary action against Mr. Romaine was influenced by any of Mr. Romaine's protected speech. Accordingly, Mr. Romaine has not met his burden to show that his protected speech was a substantial or motivating factor in the adverse employment action. Chief Swiney had adequate justification for deciding to take disciplinary action against Mr. Romaine. The record shows that Chief Swiney would have taken the adverse employment action even absent the protected speech.

To the extent that Mr. Romaine alleges that he suffered an adverse employment action when

Chief Evans told him not to warm up his automobile while the vehicle was unattended, and that Chief Evans placed restrictions on his investigations, particularly his investigation of Mayor Quade, Mr. Romaine has not shown that these are adverse employment actions in response to his protected speech.  An adverse action is an action taken by the defendant that is reasonably likely to deter a plaintiff from engaging in protected activity under the First Amendment.  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003). These restrictions were not reasonably likely to deter, nor did they deter, Mr. Romaine's criticism of Mayor Quade at the City Council meetings and to the press.  Mr. Romaine has not alleged a constitutional violation, based upon the restrictions placed upon him by Chief Evans.

Finally, it appears that Mr. Romaine argues that he has met his burden to show First Amendment retaliation because he received positive performance reviews, and because the disciplinary action took place close in time to his protected speech.  However, Mr. Romaine omits the crucial facts that undermine his claim: an independent investigation was conducted, and a decisionmaker (Chief Swiney) not involved with the protected speech made the decision to initiate disciplinary action against Mr. Romaine.  The issues of timing and performance, which may in other instances be relevant to motivation, are not relevant here.

Based upon the foregoing analysis, Mayor Quade, Ms. Kingery, and Chief Evans have shown that Mr. Romaine has not alleged a First Amendment Freedom of Speech violation, based upon the facts, taken in the light most favorable to Mr. Romaine.  Because a constitutional right has not been violated, it is unnecessary to determine whether any such right was clearly established at the time of the alleged conduct.

Mayor Quade, Ms. Kingery, and Chief Evans are entitled to qualified immunity with regard to Mr. Romaine's First Amendment Freedom of Speech claim.

*Equal Protection.*  The Equal Protection Clause prohibits a state from denying to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike.  *City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432, 439, (1985);  *Jones Intercable v. City of Chula Vista*, 80 F.3d 320, 327 (9th Cir.1996). The court should a apply a strict scrutiny analysis only  if an allegedly discriminatory classification

disadvantages a suspect class or burdens the exercise of a fundamental right. *City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. at 440. When a suspect class is not implicated, the court must determine whether the alleged discrimination is patently arbitrary and bears no rational relationship to a legitimate governmental interest. *Vermouth v. Corrothers*, 827 F.2d 599, 602 (9th Cir. 1987)(*quoting Young v. United States Parole Comm'n*, 682 F.2d 1105, 1109 (5th Cir.), *cert. denied*, 459 U.S. 1021 (1982)). Purposeful discrimination is an essential element of an equal protection clause violation. *See Personnel Administrator v. Feeney*, 442 U.S. 256, 276 (1979).

Mayor Quade, Ms. Kingery, and Chief Evans contend that they are entitled to qualified immunity with regard to a claim that they violated Mr. Romaine's right to equal protection. Although the Third Amended Complaint refers to an equal protection violation (Dkt. 68, at 29), Mr. Romaine does not address this claim in his response to the motions for summary judgment. Further, Mr. Romaine has not stated facts that would meet his burden to show that any of the defendants violated his rights to equal protection.

Mayor Quade, Ms. Kingery, and Chief Evans have shown that Mr. Romaine has not alleged an equal protection violation, based upon the facts, taken in the light most favorable to Mr. Romaine. Because a constitutional right has not been violated, it is unnecessary to determine whether any such right was clearly established at the time of the alleged conduct. Mayor Quade, Ms. Kingery, and Chief Evans are entitled to qualified immunity for an equal protection claim. Accordingly, this claim should be dismissed.

### 5.  Federal Claims Against the City of Poulsbo under 42 U.S.C. § 1983

In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted through an official custom, pattern or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity ratified the unlawful conduct. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991). The municipal action must be the moving force behind the injury of which plaintiff complains. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

As discussed above, Mr. Romaine has not met his burden to show that Mayor Quade, Ms.

Kingery, or Chief Evans violated his constitutional rights under 42 U.S.C. § 1983.  Accordingly, the City of Poulsbo cannot be held liable for Mr. Romaine's alleged violations of his constitutional rights under 42 U.S.C. § 1983.  *See Jackson v. City of Bremerton*, 268 F.3d at 653 (Neither a municipality nor a supervisor can be held liable under § 1983 where no injury or constitutional violation has occurred). Further, Mr. Romaine has not shown that there was an official custom, pattern or policy that violated Mr. Romaine's rights.

The City of Poulsbo is entitled to summary judgment on Mr. Romaine's claims under 42 U.S.C. § 1983.

### 6.  Conspiracy under 42 U.S.C. § 1985 Against All Defendants

Mr. Romaine alleged a claim under 42 U.S.C. § 1985 in his Third Amended Complaint.

To state a claim under 42 U.S.C. § 1985, a plaintiff is required to show: (1) that the purpose of the conspiracy was to deprive the plaintiff of equal protection, equal privileges and immunities, or to obstruct the course of justice in the state; (2) that the defendants intended to discriminate against the plaintiff; (3) that the defendants acted under color of state law and authority; (4) that the acts done in furtherance of the conspiracy resulted in an injury to the plaintiff's person or property or prevented him from exercising a right or privilege of a United States citizen.  *Sykes v. State of California*, 497 F.2d 197, 200 (1974).  In the absence of a viable claim under Section 1985, there can be no violation of 42 U.S.C. § 1986.  *See Baines v. Masillo*, 288 F.Supp.2d 376 (W.D.N.Y. 2003).

To prove a violation of § 1985(3), Mr. Romaine must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin v. Breckenridge*, 403 U.S. 88, 102  (1971). Nothing in the record indicates that any of the defendants' actions were motivated by "invidiously discriminatory animus."

Mr. Romaine did not address this claim in his response to the motions for summary judgment. Therefore, it does not appear that he intends to pursue this claim.  Nonetheless, Mr. Romaine has not met his burden to show that defendants violated his rights under 42 U.S.C. § 1985. First, Mr. Romaine has not shown racial or class-based discriminatory animus.  Second, he has not shown that any of the defendants caused him to be deprived of the equal enjoyment of the rights secured by law

to all.  Chief Swiney terminated Mr. Romaine, based upon an independent investigation.

Mr. Romaine has not met his burden to show that there is an issue of fact precluding summary judgment on his claim under 42 U.S.C. § 1985.

### 7.  State Claims

In his Third Amended Complaint, Mr. Romaine alleges state law claims for outrage, retaliatory constructive discharge, intentional and negligent infliction of emotional distress, negligence and negligent supervision, and defamation.

Under 28 U.S.C. § 1367, a federal court may assume supplemental jurisdiction over all other claims that are so related to claims in the action within the original jurisdiction so that they form part of the same case or controversy.  The Court may decline to exercise this supplemental jurisdiction if (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c).

By this order, all of the federal constitutional claims are dismissed.  The state law claims raise issues of state law that may be complex.  It appears that it may be appropriate for the court to decline to exercise supplemental jurisdiction over the state law claims.  The parties should show cause why the court should not dismiss the state law claims without prejudice to bringing these claims in state court.

Therefore, it is hereby

**ORDERED** that the City of Poulsbo's Motion for Summary Judgment (Dkt. 76), Defendant Kathryn H. And Douglas J. Quade Motion for Summary Judgment (Dkt. 77), Defendant Deanna S. Kingery's Motion for Summary Judgment (Dkt. 78), and Defendant Jake D. Evans' Motion for Summary Judgment (Dkt. 79) are **GRANTED** in the following respect: All claims against all defendants under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 are **DISMISSED WITH PREJUDICE**. Not later than July 2, 2010, the parties are **ORDERED TO SHOW CAUSE** why the state law claims asserted in this case should not be dismissed without prejudice to bring those claims in state

court.  If the parties fail to respond to this order to show cause, or if they otherwise fail to show cause, the court will dismiss the claims without prejudice. City of Poulsbo's motion to strike (Dkt. 129) is **GRANTED IN PART AND DENIED IN PART** as set forth herein. The City of Poulsbo's Request to Supplement Its Motion to Strike After the Court Timelines (Dkt. 136) is **GRANTED;** the motion to strike therein is **DENIED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 21st day of June, 2010.

Robert J. Bryan
United States District Judge